**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

MARCO LACARIA,

        Plaintiff,

v.

                                   Civil Action No. 3:08CV78
                                   (Judge Robert E. Maxwell)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant, the Commissioner of the Social Security Administration ("Defendant" and sometimes "Commissioner") denying the Plaintiff's claim for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 86.02.

## I. PROCEDURAL HISTORY

Marco Lacaria ("Plaintiff") filed his current application for Supplemental Security Income benefits on February 1, 2006, alleging disability since January 1, 2006, due to bi-polar and manic depressive disorders (R. 55-57, 58). The West Virginia state agency denied his claim initially and on reconsideration (R. 25-27, 31-33). At Plaintiff's request, an administrative hearing was conducted by Charles Boyer, Administrative Law Judge ("ALJ"), on August 6, 2007, at which Plaintiff, who was represented by counsel, Regina Carpenter; Tammy Lacaria, Plaintiff's mother;

and Dr. Sandra Wells-Brown, a Vocational Expert ("VE"), testified (R. 213-33). On August 31, 2007, the ALJ issued a decision finding that Plaintiff could perform a "full range of work at all exertional levels as long as the work is simple, routine and repetitive in nature and does not require him to work in close contact with others" (R. 18, 15-22). Subsequent to the decision by the ALJ, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 5-7).

## II. FACTS

Plaintiff was twenty years old at the time of the administrative hearing and on the date the ALJ issued his decision (R. 21, 55, 216). Plaintiff has a ninth-grade education and past work at a movie theater (R. 217, 250, 59, 130).

On April 26, and May 2, 2000, a psycho educational evaluation was completed on Plaintiff by Nicole M. Molnar, Ed.S., a certified school psychologist for Harrison County Schools (R. 107, 110). Plaintiff's scores on the Wechsler Intelligence Scale for Children were as follows: Verbal Scale IQ was 100; Performance Scale IQ was 83; and Full Scale IQ was 92. Those results indicated Plaintiff's verbal and full scale functions were in the average range and his performance functioning was in the low-average range. Plaintiff's scores on the WIAT were for average reading skills and low-average mathematic and writing skills (R. 109). Plaintiff informed the examiner that he was friends with ninety percent of the students in his school. He was pleasant and cooperative (R. 108-09). The examiner recommended Plaintiff for learning disability classes because the results of the "Learning Disabilities Discrepancy . . . Program indicate[d] a significant discrepancy between [Plaintiff's] verbal ability and achievement in the area of mathematics" (R. 110).

On April 24, 2002, Jessica Logar completed a Talent Assessment Program Summary Report

of Plaintiff when he was student at Bridgeport High School (R. 119). Ms. Logar found Plaintiff had "minimal strengths in the area of functional aptitudes that relate to mechanical, industrial, and technical areas that require the use of the hands. This does not mean that this individual does not have a broad range of career opportunities open to him, but quite the contrary. Many jobs do not require the use of the hands at all in the coordinated functional effort. Administrative positions, many clerical positions, many jobs in customer service, personal service, as well as sales and distributive occupations do not require functional aptitudes to any great degree. These areas should be explored by the individual to seek the most opportune career choice utilizing not only his interests but his academic areas" (R. 122).

On July 12, 2005, Louis Ortenzio, Jr., M.D., of Clay Battelle Health Associates, examined Plaintiff and found he was oriented, times three, and his cranial nerves were grossly intact. Dr. Ortenzio opined Plaintiff was calm and cooperative and his psycho social behavior was normal and appropriate, but anxious. Plaintiff made fair eye contact (R. 139). Plaintiff reported he was "generally depressed" and "[fought] with his brother & dad . . . ." Plaintiff reported he had "no job" and "dropped out of school." His smoking had increased. He had no suicidal thoughts or ideations. Dr. Ortenzio diagnosed depression with cyclothymic tendencies and prescribed Symbyax (R. 138).

On August 11, 2005, Dr. Ortenzio found Plaintiff was calm and cooperative. He was oriented, times three, and his cranial nerves were grossly intact. Dr. Ortenzio opined Plaintiff's psycho social behavior was normal and appropriate. Dr. Ortenzio found Plaintiff was "calm" and had "no outburst" (R. 137). Plaintiff reported he was "much calmer at home," and he was "polite, jovial, quiet" and "thinking about GED." Plaintiff medicated with Symbyax. Dr. Ortenzio diagnosed depression with cyclothymia components (R. 136).

On October 13, 2005, Dr. Ortenzio examined Plaintiff. His psycho social behavior was normal and appropriate. Dr. Ortenzio opined Plaintiff was cooperative, "cool, calm collected" and oriented, times three. He described Plaintiff as "bright, smiley . . . ." Dr. Ortenzio opined Plaintiff's cranial nerves were intact (R. 135). Dr. Ortenzio noted that Plaintiff's family believed he had "totally turned his life around." Plaintiff was "much less irritable, . . . goal oriented, clean, neat, cooperative, couldn't remember things before now he has much better attention." Dr. Ortenzio diagnosed "depression . . . with cyclothymic controlled" and prescribed Symbyax (R. 134).

Dr. Ortenzio's January 23, 2006, examination of Plaintiff was normal. Dr. Ortenzio found Plaintiff's psycho social behavior was appropriate and normal and he was calm and cooperative (R. 133). Plaintiff reported to Dr. Ortenzio that he "like[d] job @ Hardee's." Dr. Ortenzio noted Plaintiff was making progress with "responsibility." Plaintiff "recognized weight gain but [felt] that even if medication (Symbyax) caused [it, it] [was] worth it." Plaintiff was considering obtaining his GED. Dr. Ortenzio diagnosed "depression with cyclothymic components controlled" and epistaxis. He prescribed a vaporizer, humidifier and bacitracin for treatment of Plaintiff's nosebleeds (R. 132).

On February 1, 2006, Sohrab Shahab, M.D., a resident at the WVU Department of Otolarynogology, and Hassan Ramadan, M.D., professor and vice chair of that department, examined Plaintiff for epistaxis. Plaintiff reported his nosebleeds occurred more on the right than the left and lasted for one-half to one hour. Plaintiff reported he experienced a headache contemporaneously with the nosebleeds. Drs. Shahab and Ramadan noted Plaintiff smoked one package of cigarettes a day. Plaintiff was five feet, ten inches tall and weighed three-hundred pounds. The examination produced normal results and the diagnosis was for epistaxis of unknown etiology (R. 123).

Plaintiff's February 4, 2006, CT scan of his sinuses was normal (R. 129).

On March 20, 2006, Plaintiff had a follow-up appointment at Clay Battelle Health Services. He reported he was working at Cinemark and was "very happy in job." He stated his coworkers called him "'Little Hercules.'" Plaintiff stated his "nerves were so much better" (R. 130). Plaintiff's examination revealed he was calm and cooperative. He was oriented, times three. His cranial nerves (II-XII) were normal (R. 131). The physician discussed with Plaintiff the benefits and "downfalls" of medicating with Zyprexa. Plaintiff was diagnosed with bipolar disorder and atypical depression; Plaintiff was stable (R. 130).

On April 11, 2006, Martin Levin, M.A., a psychologist, completed an Adult Mental Profile of Plaintiff. He noted Plaintiff was cooperative and pleasant and was appropriately dressed. Plaintiff reported he lived with his family – mother, father, and two brothers. Plaintiff stated his childhood was happy, "everybody got along well" and "things are good at home" (R. 140).

Plaintiff's chief complaint was that he had a "difficult time working with other people and that he [got] aggravated easily." Plaintiff informed Mr. Levin that he had a learning disability; he worked at Cinemark Theater. Plaintiff stated he had "poor impulse control both at home or when he [was] out in public." Plaintiff stated he had mood swings that ranged from being depressed "to easily angered to feeling sad and anxious." Plaintiff informed Mr. Levin he had decreased energy, memory and concentration. Plaintiff stated his sleep was poor (R. 140). Plaintiff reported crying spells twice weekly (R. 140-41). Plaintiff stated he had had suicidal ideations in the past and had once cut his wrists. Plaintiff informed Mr. Levin he had experienced "bouts of impulsive hitting, rolling on the floor and screaming." Plaintiff reported having panic attacks that included "hyperventilation, tachycardia, becoming hot and sweaty and fearful and having chest pains." Plaintiff stated he had had "only a few of these and they [did] not occur on a regular basis" (R. 141).

Mr. Levin noted Plaintiff was medicating with Symbyax as prescribed by Dr. Ortenzio but had not received any other mental health treatment. Plaintiff reported he had completed the tenth grade of high school and then quit; he had "few friends and got along with most his teachers although he felt that a lot of them did not like him." Plaintiff informed Mr. Levin that he had not obtained his GED but "he [was] working on it." Dr. Levin noted Plaintiff stated his longest tenure of employment was for four months at McDonald's (R. 141). As to Plaintiff's social functioning, Plaintiff informed Mr. Levin that he "[got] along okay with other people that he normally 'hangs out with'" and that "people at work g[a]ve him a hard time and he [was] concerned that he mat [sic] act out under those circumstances" (R. 142).

Plaintiff scored the following on the WAIS III: Verbal IQ was 89; Performance IQ was 77; Full Scale IQ was 82 (R. 141). Plaintiff scored the following on the WRAT III: reading was 91 (high school); spelling was 92 (eighth grade); and arithmetic was 84 (sixth grade) (R. 142).

The results of Plaintiff's mental status examination were: attitude/behavior were pleasant and cooperative; speech was normal and communication was adequate; orientation was oriented to person, place and time but not circumstance as Plaintiff "did not know why he was being evaluated"; mood was mildly depressed; affect was restricted; thought process was positive for "some thought blocking"; thought content was normal; perception was negative for hallucinations and illusions; insight was moderately deficient; psychomotor behavior was normal; judgment was mildly deficient as based on the "scaled score of seven on the comprehension subtest of the WAIS-III"; no suicidal or homicidal ideations; immediate memory was mildly deficient; recent memory was normal; remote memory was normal; concentration was mildly deficient; persistence was normal; pace was normal; Plaintiff's social functioning during evaluation was pleasant and cooperative and, except for a

showing of being mildly depressed, was otherwise socially appropriate (R. 142).

Plaintiff reported his activities of daily living were as follows: worked from 1:00 p.m. to 8:00 p.m. at the movie theater; reported to his employer that he was ill "because he [did] not want to work on a particular day"; spend a "good deal of time" using his computer; cleaned his room; cared for his cat; "h[u]ng out with his brothers"; played guitar; recorded the songs he wrote; ate dinner with his family; and watched television in the evenings and on the days he was not working. Plaintiff did not attend church or belong to any social organizations (R. 142-43). Plaintiff listed his activities as "[w]orking, working on his computer, taking care of his pets, playing guitar . . ." (R. 143).

Mr Levin's diagnosis was as follows: Axis I –bipolar disorder, most recent episode mixed, moderate, and impulse control not otherwise specified; Axis II – features of panic disorder; and Axis III – no conditions present. Mr. Levin's diagnosis rationale for bipolar disorder was "based on the [Plaintiff's] describing regular mood swings that go from being depressed and sad to easily angered and irritated . . . having sleep and appetite disturbances as well as crying spells and a history of suicidal ideations." Mr. Levin's diagnosis of features of panic disorder was based on Plaintiff's "describing a full blown panic attack but . . . this only occur[red] rarely and [was] not a regular event." Mr. Levin's diagnosis of impulse control disorder NOS was "based on the [Plaintiff's] describing temper tantrums where he screams, hits and throws himself on the floor." Plaintiff's prognosis was good; he could manage his own finances (R. 143).

On April 19, 2006, Joseph A. Shaver, Ph.D., completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff had impairments that were not severe. Plaintiff had organic mental disorders and affective disorders (R. 144). Dr. Shaver found Plaintiff's organic mental disorder was impulse control, NOS; his affective disorder was "bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and

currently characterized by either or both syndromes)" (R. 145, 147). Dr. Shaver found Plaintiff had mild restrictions of activities of daily living; mild limitations in maintaining social functioning; and mild limitations in maintaining concentration, persistence, or pace. Dr. Shaver found Plaintiff had experienced no episodes of decompensation (R. 154). Dr. Shaver opined Plaintiff "possess[ed] the mental capacity to maintain gainful employment on a sustained basis" (R. 156).

On June 9, 2006, Amy Cottrell, an evaluator at United Summit Center, completed an Initial Assessment of Plaintiff. Plaintiff was referred for treatment by Dr. Ortenzio; he was accompanied to this examination by his father. Ms. Cottrell noted Plaintiff presented with the "following moderate symptoms: anxiety, guilt, poor concentration, distractibility, panic, impulsivity, and hopelessness/helplessness." Plaintiff denied any suicidal or homicidal ideations or intent. Plaintiff reported he had been "dealing with depression, anxiety, impulse control problems, and difficulty with social interaction since he was a very small child." Plaintiff reported he always "preferred to do things on his own" and this preference caused him to have "problems with school and keeping a job" (R. 195). Plaintiff stated he could "not keep a job because of his problems interacting with people he [did] not know." Plaintiff had "lost approx[imately] 13 jobs in 8 months," and he was seeking employment at the time of the assessment (R. 196). Plaintiff's father reported Plaintiff desired to "be at home." Plaintiff reported he used to "throw himself down the stairs at school so he could [go] home." Plaintiff reported he experienced severe mood swings, hostility and frustration. Plaintiff informed Ms. Cottrell he "used to break things and hit things a lot when he would become angry." Plaintiff stated he had "lock[ed] himself in his room and would sometimes yell out his window when he became anxious or frustrated" in the past. Plaintiff reported experiencing panic attacks when he was "around people he [was] unfamiliar with." Plaintiff stated

8

he did not "trust unfamiliar people if he ""[got] a bad vibe from them."" He stated he did not trust people who were not ""nice"" (R. 195).

Plaintiff informed Ms. Cottrell that he had been medicating his condition with Symbyax for one year, and, since he began taking the medication, his "depression, hostility, violence, and impulsivity [had] decreased significantly." Plaintiff reported he "still [experienced] some dysfunction in social settings and [could not] remain employed, but he [was] not [sic] longer behaving aggressively" (R. 195-96). Plaintiff stated the medication caused him to "remain[] at a level where he [wasn't] really happy or depressed" and that he desired to change medications because he had gained weight and experienced ""no motivation"" while taking Symbyax (R. 196).

Plaintiff stated he experienced "mild auditory hallucinations that [had] been present for 1-2 years." Ms. Cottrell noted Plaintiff "allege[d] that he [heard] a voice, which he refer[red] to as Ian Brown, that [sic] help[ed] him through his daily activities." Plaintiff reported the voice gave him directions "on what to do, such as brush his teeth, and that he [was] not scared by the voice." Plaintiff stated the voice had "never told him to hurt himself or others and that it occasionally [made] ""weird comments."" The voice did "not control his actions" (R. 196).

Ms. Cottrell made the following findings as to Plaintiff's mental status: Plaintiff was pleasant, interactive, alert, and oriented, times four. Plaintiff's mood was good; his affect was flat. Plaintiff's insight and judgment "seemed fair" (R. 197). Plaintiff's thought concept and sociability were within normal limits (R. 202). Plaintiff presented with no hostility, self neglect, self injury, oppositional behavior, or bizarre behavior. Plaintiff was mildly withdrawn and moderately impulsive. Plaintiff's depression was mild, guilt was moderate, anxiety was moderate, panic was moderate, feelings of hopelessness or helplessness were moderate, distractibility was moderate,

concentration was moderate, and paranoia was mild. Plaintiff did not present with blunted or inappropriate affect, phobic behavior, manic behavior, agitation, hyperactivity, sleep disturbances, eating disturbances, concept disorganization, thought blocking, or delusions (R. 203).

Ms. Cottrell noted the criteria Plaintiff met for the diagnosis of Bipolar II Disorder were as follows: one or more major depressive episodes; never a mixed or manic episode; and symptoms that caused "clinically significant distress or impairment in social, occupational, or other important areas of functioning." Ms. Cottrell noted Plaintiff met the following criteria for Social Phobia: "a marked or persistent fear of one or more social or performance situations in which [Plaintiff] [was] exposed to unfamiliar people or possible scrutiny by others"; anxiety, possibly in the form of a panic attack, resulted from exposure to the "feared situation"; recognition that fear was excessive and/or unreasonable; the "feared social or performance situations [were] avoided or else [were] endured with intense anxiety or distress"; and the "avoidance or distress in the social or performance situations interfer[ed] significantly with the person's occupational functioning or social relationships" (R. 197).

Ms. Cottrell's recommendation was that Plaintiff "see" a medical doctor at United Summit Center and begin individual therapy at the facility (R. 197).

On June 22, 2006, G. David Allen, Ph.D., completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff had impairments that were not severe and those impairments were organic mental disorders and affective disorders (R. 158). Dr. Allen found Plaintiff's organic mental disorder was impulse control disorder, NOS, and his affective disorder was "bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)" (R. 159, 161). Dr.

10

Allen found Plaintiff was mildly limited in his activities of daily living, mildly limited in his ability to maintain concentration, persistence, or pace, and mildly limited in his ability to maintain social functioning. Dr. Allen found Plaintiff had not experienced any episodes of decompensation (R. 163). Dr. Allen opined that Plaintiff was "[n]ow doing well enough on Zyprexa to hold a job." Dr. Allen noted Plaintiff had earlier stated (in March, 2006) that he was happy at his job at the movie theater and that his nerves were "much better" (R. 170).

On August 15, 2006, Lisa Schaffner, M.D., a physician at United Summit Center, completed a psychiatric evaluation of Plaintiff. Plaintiff reported the following activities, symptoms and incidents to Dr. Schaffner: Plaintiff experienced anxiety around people and in groups for as long as he could remember; he felt people stared at him; he worried about terrorists; he believed the world would end soon; he watched television news frequently; he interacted with his two brothers daily; he listened to music daily; he rarely left his parents' backyard; Plaintiff stayed awake all night; he slept beginning in the mornings; he usually ate at 4:00 a.m.; he would leave the house to buy fast food if one of his brothers accompanied him; he would eat with his family if no other person/people joined the meal; Plaintiff had "attacks of ten minute duration where he . . . scream[ed] and jump[ed] up and down or [threw] himself against the wall"; the attacks were not precipitated by anything; he had chased one brother with a knife, threatened to kill that brother, and believed he would have killed the brother; he experienced violent outbursts, one in the form of attacking his brother because the brother spent a longer period of time in the bathroom than Plaintiff expected; he blacked out after the physically violent outbursts; when his blackout was finished, he had no memory of his physically attacking others; he felt the onset of the violent outbursts that led to physical violence; he heard voices on a daily basis; Plaintiff stated one voice belonging to Ian was "'more like'" he was and

always spoke positive messages and another voice, that belonging to Gregg, was the "'opposite of'" Plaintiff and always spoke negative messages; Plaintiff reported neither voice ever instructed him to hurt himself or attack others; and he felt "'scared of the future.'" Plaintiff reported he planned to become a cameraman; he denied suicidal or homicidal ideations. Plaintiff reported he had no manic symptoms (R. 187).

Plaintiff's mother, who accompanied Plaintiff to the evaluation, reported Plaintiff's psychiatric history as follows: Plaintiff began withdrawing from others when he was three or four years old; Plaintiff requested to sit at a table alone in kindergarten; Plaintiff pretended to be ill in order to miss school; Plaintiff was tested for and diagnosed with a learning disability while in middle school; Plaintiff only medicated with Symbyax, which reduced Plaintiff's angry outbursts for about one year, but the angry outbursts were becoming more frequent recently; and Plaintiff was never hospitalized for any psychiatric reasons (R. 188). Plaintiff's mother reported she and one of Plaintiff's brothers were "able to calm him down" (R. 187).

Plaintiff reported he smoked one package of cigarettes per day and occasionally drank alcohol. He stated he had experimented with drugs while in the seventh grade; he took "everything, all the time'" (R. 188).

Plaintiff reported he had a keen interest in music, which started when he was a young child. Plaintiff taught himself to play the guitar and piano. Plaintiff could not read music. Plaintiff stated "he would go without sleep in order to keep listening to music." Plaintiff stated he had imaginary friends, both as a young child and at this current age. Plaintiff informed Dr. Schaffner that he "never really had friends as a child." Plaintiff reported that by the "time he was in the sixth grade he would enter the [school] building through one door and then proceed right to the door on the other side [of

the school building] and would actually arrive home before his mother arrived home after having dropped him off" at school. Plaintiff stated he was excessively absent from school. His unexcused absences were so numerous that he had to repeat the ninth grade three times (R. 189).

Dr. Schaffner observed Plaintiff had no abnormal movements, stiff posture, intermittent eye contact, little spontaneous speech, soft speech volume, and "'scared'" mood. Dr. Schaffner opined Plaintiff's affect was "somewhat blunted"; his thought processes were "linear and logical, but he had difficulty elaborating regarding his anxiety"; insight was fair, judgment was fair, and intelligence was average to above average. Dr. Schaffner noted Plaintiff "hear[d] voices, at least two male voices on a daily basis, which remark[ed] on him and his surroundings"; denied command hallucinations; denied suicidal ideations; and presented with no delusion (R. 189).

Dr. Schaffner assessed the following: Axis I – social anxiety disorder, generalized type, consider Asperger's disorder, and nicotine dependence; Axis II – schizotypal personality features; Axis III – obesity and hypertension; Axis IV – unemployed; and Axis V – GAF 46 (R. 189-90). Dr. Schaffner's treatment plan was for Plaintiff to be medicated with Trileptal, to taper off Symbyax, to continue with individual therapy for anxiety, and to return in two weeks (R. 190).

Christina M. Reel, a therapist/evaluator at United Summit Center, completed a Diagnostic Impression and Service Plan of Plaintiff on June 19, 2007. She diagnosed Plaintiff with Bipolar II Disorder and social phobia. She based her diagnosis of Bipolar II Disorder on the presence of history of one or more major depressive episodes by Plaintiff; presence or history of at least one or more hypomanic episodes; negative for a mixed or manic episodes; and symptoms caused "clinically significant distress or impairment in social, occupational, or other important areas of functioning." Ms. Reel based her diagnosis of social phobia on Plaintiff's having "a marked and persistent fear of

one or more social or performance situations in which the person is exposed to unfamiliar people or possible scrutiny by others"; exposure to the "feared situation almost invariably provokes anxiety, which may take the form of a panic attack"; recognition that "fear is excessive or unreasonable"; avoidance or endurance, with intense anxiety and/or distress, of the feared situation or event; and the avoidance and/or distress caused by the social or performance situations interferes"significantly with . . . occupational functioning or social relationships." Ms. Reel recommended Plaintiff continue with his "pharmacological management with Dr. Rush every three weeks or as needed," to "continue to have his reassessment every six months," and that Plaintiff continue with individual therapy once per month" (R. 180). Ms. Reel noted Plaintiff was mildly dysfunctional in "Domain I, II, II, and IV," and that he "[knew] that he need[ed] treatment"; had been taking his medications; and had a mother and father who cared for him (R. 186).

The goals set by Ms. Reel for Plaintiff were as follows: Plaintiff would "eliminate all hostile behaviors to improve his overall daily functioning in life" through therapy and Plaintiff would "experience less anxiety to improve overall functioning in his life" through therapy (R. 182, 183). Ms. Reel noted Plaintiff had "been somewhat compliant when it [came] to his doctor's appointments"; Plaintiff was a "musician who [slept] during the day and [played] at night"; and that Plaintiff "enjoy[ed] being at home and by himself" (R. 182-84). Ms. Reel noted Plaintiff was medicating with Lithium and Seroquel (R. 182-83).

On June 28, 2007, Ms. Reel opined Plaintiff had never been an inpatient or hospitalized for bipolar disorder or social phobia. She found Plaintiff's activities of daily living were completed with minimal assistance. Plaintiff was oriented, times four. His speech, thought concept, and appearance were within normal limits. Plaintiff's sociability was listed as "isolation" (R. 175). Plaintiff had no current suicidal or homicidal thoughts or ideations. Ms. Reel opined Plaintiff was mildly hostile,

was not violent, had never demonstrated self-neglect, and had no current thoughts of self-injury. Plaintiff, according to Ms. Reel, was negative for oppositional behavior; had moderate withdrawal; had mild impulsivity; had mild poor judgment; and did not present with any bizarre behavior. Ms. Reel found Plaintiff had mild hallucinations, no delusion, and moderate paranoia. Plaintiff's tangential thinking, loose association, and thought blocking processes were normal. Plaintiff had mild concentration and moderate suspicious tendencies. Ms. Reel found Plaintiff's depression was mild, feelings of guilt were mild, anxiety was moderate, and feelings of hopelessness and helplessness were moderate. Plaintiff was determined to have mild apathy, moderate panic, moderate manic, moderate agitation, moderate energy, mild distractibility, moderate change in appetite, mild loss of interest, and acute increased/decreased sleep. Plaintiff's affect was normal; he had no phobic tendency. Ms. Reel noted Plaintiff medicated with Lithium and Seroquel, which reduced symptoms (R. 176).

Evidence Received During the Hearing

On July 5, 2007, Plaintiff's counsel corresponded with Dr. Sandy Rush, who, according to the letter, was Plaintiff's treating physician at United Summit Center. The letter contained questions to the doctor, to which she provided answers. Dr. Rush wrote Plaintiff was first treated by her on April 19, 2007. Dr. Rush wrote Plaintiff was diagnosed with bipolar disorder and intermittent explosive disorder. Dr. Rush noted Plaintiff had symptoms of mood irritability and sleep disturbances. Dr. Rush wrote that Plaintiff had a long history of mood instability but that the symptoms were "improving [with] meds" (R. 206). Dr. Rush, according to Plaintiff's "Claimant's Medication" form that he filed with the Social Security Administration, prescribed Seroquel and Lithium to Plaintiff for treatment of "sleep, mood stability" and bipolar disorder, respectively (R.

15

106). Dr. Rush opined Plaintiff could work on a full time basis "possibly later . . . after achieving stabilization with meds" (R. 206).

Dr. Rush completed a Medical Assessment of Ability to do Work-Related Activities (Mental) of Plaintiff on July 11, 2007. She opined Plaintiff's ability to follow work rules, use judgment, interact with supervisor, deal with work stresses, and maintain attention and concentration was fair. Plaintiff's ability to relate to co-workers and deal with the public was poor. Plaintiff's ability to function independently was good (R. 208-09). Dr. Rush noted that Plaintiff "still [had] some racing thought & mood instability that may impair" his ability to perform as noted above. Dr. Rush found Plaintiff's ability to understand, remember, and carry out simple job instructions was good. Plaintiff's ability to understand, remember, and carry out detailed, but not complex, job instructions was fair. Plaintiff's ability to understand, remember and carry out complex job instructions was poor (R. 209). Dr. Rush found Plaintiff's ability to maintain his personal appearance, behave in an emotionally stable manner, and demonstrate reliability was fair; his ability to relate predictably in social situations was poor. Dr. Rush opined Plaintiff could manage his own benefits (R. 210).

Administrative Hearing

Plaintiff testified, when questioned at the administrative hearing by his counsel, that he quit school because he felt as if others were staring at him and as if his work product was "never good enough for the teacher." Plaintiff stated he quit school and then returned at the urging of his parents; however, he "ended up just walking out every single day" (R. 217).

Plaintiff testified he worked at a Dairy Queen after quitting school, but he quit that job because the management would "only give [him] four-hour shifts once a week" and it was not "satisfied with anything [he] did." Plaintiff stated he then worked at Hardee's, but that was "when things got really bad." He testified he "pretty much [had] a mental breakdown" while employed at

16

Hardee's because the management there "just kept on pushing me down further and further down the scale on what to do." Plaintiff stated he was fired from his employment at Hardee's after one month because of his nose bleeds (R. 218). Plaintiff testified he next worked at a movie theater. Initially, he helped construct the building; the construction job lasted approximately one and one-half months. Plaintiff stated he did "fine with the construction" job "because they let [him] have – there's [sic] ten areas in that so they gave me one area pretty much to me to do what they knew I could do." Plaintiff testified he did not have "any frustration" toward any of his construction co-workers, even though he was "scare[d]" and the construction co-workers were "very rude most of the time." Plaintiff stated that he was employed at the theater once it opened for business, but "when all the people came, and the – it just got so hectic, [he] would literally have panic attacks" (R. 219). Plaintiff reported he worked at the theater after it opened for business for one and one-half months and had been fired from that job on "Easter," 2006, "for sitting down." Plaintiff stated he attempted to gain employment after he was fired from the theater, but "McDonald's wouldn't hire" him. "Nobody would hire [him]" (R. 220).

Plaintiff testified he was receiving treatment at the United Summit Center, where the therapist "pretty much just tr[ied] to figure out why [he] [was] this way" (R. 220).

Plaintiff stated he awoke at 7:00 p.m. He testified he did not sleep because people, who weren't "even there" talked to him about "random off the wall stuff." Plaintiff stated he sometimes would type what the other person was saying to him so he could "see if it [made] any sense to anybody else." Plaintiff testified that the people who weren't there talked to him "all the time, every, every minute." Plaintiff stated it was happening "right now" at the hearing. Plaintiff testified he could sleep in the day because he becomes "so worn out over the night because [he was] always on

17

the computer, just randomly doing stuff, like mixing something just for fun" (R. 221). Plaintiff stated he could push the voice away sometimes; the voice was not "a loud volume"; and he could cause the voice to go "totally out of the picture to where [he] [didn't] hear anything" (R. 221-22). Plaintiff testified that "once [he] start[ed] sitting down, there [would be] silence" but that the presence of the voice "really, really, really ends the whole point of [his] just sitting there trying to have a conversation with [his parents]. Because even though [he was] listening to [his parents], it's always something in the back of my head just talking, talking" (R. 222).

Plaintiff testified his medications helped him sleep but not with the "schizophrenic part" of his condition. Plaintiff stated the medications did not "fix[] the problem" (R. 222). Plaintiff stated the mood stabilizer medication was treatment for episodes, such as, his chasing his brother with a knife after the brother threatened to delete Plaintiff's work on the computer. Plaintiff testified he still experienced panic attacks "everyday, and they felt like a room was "clos[ing] in on [him]" (R. 223). Plaintiff testified that his anger outbursts, incidents wherein he would get "in a fight with someone and [that person was] pretty much defendless [sic]," were not improved by medication and that his ability to control such outbursts depended "on the situation" and "how serious it [was] to [him] at that time" (R. 224). Plaintiff testified he was able to "control the physical violence part" of his behavior as toward his family (R. 225).

Plaintiff listed his activities of daily living as follows: sorted his dirty laundry and helped his brothers take out the garbage (R. 225-26). Plaintiff stated he could do those chores alone, but "probably wouldn't" complete them. He testified he only does activities when his brothers ask him to participate. Plaintiff stated he stayed "in [his] bed all the time, just sitting there" (R. 226).

Plaintiff testified he did not drive because he was "scared to have other people's lives in [his]

hand" (R. 226). Plaintiff stated he did not obtain a driver's license when he became eligible because his brother had a license and he had "so many friends that drive" (R. 227).

Plaintiff's mother testified and she agreed with Plaintiff's testimony. She stated that Plaintiff tried to complete chores, but he had to be instructed on their completion in great detail. She testified that for Plaintiff to take out the garbage, he would have to be told he must "go to the garbage and take the garbage out of the can, carry it to the curb." Mrs. Lacaria testified Plaintiff would "panic" in a situation that involved his getting his driver's license (R. 228). Mrs. Lacaria testified Plaintiff did not shower unless she instructed him. She stated she would not let him use the stove on his own to cook. Mrs. Lacaria testified that, even though her son was intelligent, he could not take out the garbage or cook without instructions because "these voices that he hears it's so much going on in his head all the time that he just can't . . . ." She stated he had "to really try to separate what's the reality from the nonreality. And it's very confusing for him" (R. 229).

VE Testimony

The ALJ asked the VE the following question: ". . . I've asked you to review the limitations now in Exhibit 8-F from Dr. Rush. And you reviewed those limitations?" To which the VE responded: "Yes, Your Honor" (R. 230). The ALJ then asked the VE the following question:

> Considering his age and education, and emphasizing actually the definitions of the limitations found on page 5 of Exhibit 8-F. Insofar as the partial abilities sometimes some good, some fair, some poor. If I ask you to assume the limitations with the definitions contained on this report from Dr. – from the doctor. Would there be any jobs that he would be considered capable of performing? (R. 231).

The VE responded as follows:

> . . . I think there would be. I think it would – I think there would be, it would have to be simple jobs that did not involve working with the public or dealing with very much in social situations. And some examples of that would be – . . . – an order

filler at the unskilled light level. Approximately 185,000 nationally, approximately 1,100 in West Virginia. Another example would be cleaning positions at the unskilled light level. Approximately 650,000 nationally and approximately 4,400 in West Virginia. Also cleaning positions at the unskilled medium exertional level, Your Honor. Approximately 1.4 million nationally, and approximately 10,000 in West Virginia. And those are just representative and not exhaustive numbers. . . (R. 231).

When the ALJ asked the VE if there were jobs available to Plaintiff when the limitations to which he and his mother testified were considered, the VE responded there were no jobs available to Plaintiff (R. 231).

Plaintiff's counsel asked the VE what "time off task" would be permissible in the jobs the VE named to allow for continued employment. The VE responded that "no more than 10 to 15 percent of the time off of task" would be acceptable for a person to maintain employment in the jobs he listed. The VE testified a person would "not be allowed to miss any more than one, possibly two days per month. . .," but one day missed is "more typical[]" (R. 232).

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 416.920 (1997), ALJ Boyer made the following findings:

1. The claimant has not engaged in substantial gainful activity since February 1, 2006, the application date (20 CFR 416.920(b) and 416.971 *et seq.*) (R. 17).

2. The claimant has the following severe impairment: a bipolar affective disorder (20 CFR 416.920(c)) (R. 17).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926). In reaching this conclusion, the undersigned has relied in pertinent part on the opinions of the State Agency expert medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion. Those opinions, by physicians skilled in the disability review process, are well supported

in the record and entitled to substantial weight. (20 CFR §§416.927 and Social Security Ruling 96-6p) (R. 17).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels as long as the work is simple, routine and repetitive in nature and does not require him to work in close contact with others (R. 18).

5. The claimant has no past relevant work (20 CFR 416.965) (R. 20).

6. The claimant was born on November 14, 1986; he was 19 years old at this filing date and is presently 20 years old, at all pertinent times a "younger individual" (20 CFR 416.963) (R. 21).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964) (R. 21).

8. Transferability of job skills is not an issue because the claimant does not have vocationally relevant past work experience (20 CFR 416.968) (R. 21).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform (20 CFR 416.960(c) and 416.966) (R. 21).

10. The claimant has not been under a disability, as defined in the Social Security Act, since February 1, 2006, the date the application was filed (20 CFR 416.920(g)) (R. 22).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that

substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Secretary's decision, the reviewing court must also consider whether the administrative law judge applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1.  This decision must be reversed and remanded because the ALJ failed to perform any credibility analysis whatsoever in violation of the Social Security Administration's regulations and rulings and Fourth Circuit case law (Plaintiff's brief at p. 5).

The Commissioner contends:

1.  Plaintiff does not meet or equal a listing (Defendant's brief at p. 8).[1]

2.  The ALJ properly found Plaintiff's statements concerning his alleged symptoms not entirely credible (Defendant's brief at p. 9).

3.  Plaintiff could perform work existing in significant numbers in the national economy (Defendant's brief at p. 12).[1]

## C. Credibility Analysis

Plaintiff contends the ALJ's decision must be reversed and remanded because the ALJ failed to perform any credibility analysis whatsoever in violation of the Social Security Administration's

---

[1]Defendant argues contentions one and three as listed above; however, Plaintiff argues only the credibility issue in his Motion for Summary Judgment and Brief in Support of his Motion for Summary Judgment. Inasmuch as Plaintiff did not allege the ALJ erred in his decision that Plaintiff did not meet a listing or that he could perform work existing in significant numbers in the national economy, the undersigned only addresses Plaintiff's contention that the ALJ's credibility analysis is flawed in this Report and Recommendation/Opinion.

regulations and rulings and Fourth Circuit law. The Plaintiff alleges the ALJ "perform[ed] no credibility analysis whatsoever of either [Plaintiff's] or his mother['s] . . . testimony" (Plaintiff's brief at p. 5). Defendant contends the ALJ properly found Plaintiff's statements concerning his alleged symptoms not entirely credible.

In *Craig v. Chater,* 76 F.3d 585, the Fourth Circuit developed the following two-step process for determinating whether a person is disabled by pain or other symptoms:

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

*Craig, supra,* at 594.

In his decision, the ALJ found the following as to Plaintiff's credibility:

> After considering the evidence of record, the undersigned finds the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms . . . (R. 19).

The undersigned finds the ALJ fully complied with the first threshold step in *Craig*; therefore, the ALJ was required to evaluate Plaintiff's complaints of pain in conformance with step two of *Craig*, *Id.*, at 594. In concluding the analysis, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" (R. 19) and then went on to consider Plaintiff's medical history, results of laboratory findings, objective medical evidence of record, medical treatment used to alleviate Plaintiff's symptoms, Plaintiff's activities of daily living, and Plaintiff's statements and Plaintiff's mother's statements relative to his condition. As Plaintiff noted in his brief, SSR 96-7p reads as follows:

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations had been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight.

As noted above and discussed below, the ALJ did not make "a single, conclusory statement"; he issued "specific reasons" for his finding as to Plaintiff's credibility.

The ALJ considered Plaintiff's history of mental disorders. He noted Plaintiff had experienced panic attacks and anger outbursts since high school; Plaintiff had attended modified classes for "'low-level learners'"; Plaintiff claimed he could not maintain employment due to his emotional instability and panic attacks; and that Plaintiff had been evaluated and treated for his mental health disorders (R. 19-20).

The ALJ considered the objective medical evidence and the results of the mental health evaluations and testing that are contained in the record of evidence. The ALJ noted Plaintiff was of

average intelligence, based on Full Scale IQ score of 100 in May, 2000, and his Full Scale IQ score of 82 in April, 2006. The ALJ evaluated Mr. Levin's April, 2006, opinions that Plaintiff was mildly depressed; he behaved in a socially appropriate manner; his concentration was "only mildly impaired"; and his persistence and pace were within normal limits. The ALJ also noted Mr. Levin's diagnoses of bipolar disorder, panic disorder, and impulse control disorder were based on Plaintiff's statements to him that he had mood swings, rarely had panic attacks, and had "temper tantrums where he scream[ed], hit[], and [threw] himself on the floor" (R. 20).

The ALJ also evaluated, considered, and weighed the medical evidence provided by Dr. Rush. He noted Dr. Rush found Plaintiff had a "'poor'" ability or was "seriously limited but not precluded [in his] ability to relate to co-workers, deal with the public, understand, remember and carry out complex instructions and relate predictably in social situations." The ALJ considered Dr. Rush's finding that Plaintiff had a "'fair,' or limited but satisfactory ability to follow work rules, use judgement [sic], interact with supervisors, maintain attention and concentration, carry out detailed job instructions, maintain personal appearance, behave in an emotionally stable manner, and demonstrate reliability." The ALJ also considered Dr. Rush's opinion that Plaintiff had "'good' or more than satisfactory ability to function independently and to understand, remember and carry out simple job instructions" (R. 20).

In addition to the above evidence that was considered by the ALJ in his decision, the record contains other objective medical evidence and results of the mental health evaluations and testing that support the ALJ's finding as to Plaintiff's credibility. On July 12, 2005, Dr. Ortenzio opined Plaintiff was oriented, times three; his cranial nerves were grossly intact; he was calm and cooperative; and his psycho social behavior was normal (R. 139). On August 11, 2005, Dr. Ortenzio

found Plaintiff was calm and cooperative; he was oriented, times three; his cranial nerves were grossly intact; his psycho social behavior was normal and appropriate; he had had "no outbursts" (R. 137). Dr. Ortenzio found, on October 13, 2005, that Plaintiff's psycho social behavior was normal and appropriate. He opined that Plaintiff was "cool, calm" and "collected." Plaintiff was cooperative (R. 135). On January 23, 2006, Dr. Ortenzio found Plaintiff was calm and cooperative; his psycho social behavior was appropriate and normal. Dr. Ortenzio opined Plaintiff was making progress with "responsibility." Dr. Ortenzio noted Plaintiff's depression, with cyclothymic components, was controlled (R. 132).

The record of evidence contains the opinion of Dr. Shaver, who completed a Psychiatric Review Technique of Plaintiff, which supports the ALJ's credibility decision. Dr. Shaver found Plaintiff had mild restrictions of activities of daily living; mild limitations in maintaining social functioning; and mild limitations in maintaining concentration, persistence, or pace (R. 154).

The record contains evidence from counselors at United Summit Center that support the ALJ's credibility analysis. On June 9, 2006, Plaintiff was pleasant, interactive, alert, and oriented, times four. Plaintiff's mood was good; his affect was flat. Plaintiff's insight and judgment "seemed fair" (R. 197). Plaintiff's thought concept and sociability were within normal limits (R. 202). Plaintiff presented with no hostility, self neglect, self injury, oppositional behavior, or bizarre behavior. Plaintiff was mildly withdrawn and moderately impulsive. Plaintiff's depression was mild, guilt was moderate, anxiety was moderate, panic was moderate, feelings of hopelessness or helplessness were moderate, distractibility was moderate, concentration was moderate, and paranoia was mild. Plaintiff had no blunted or inappropriate affect, phobic behavior, manic behavior, agitation, hyperactivity, sleep disturbances, eating disturbances, concept disorganization, thought

blocking, or delusions (R. 203). On August 15, 2006, a physician at United Summit Center found Plaintiff's affect was "somewhat blunted"; his thought processes were "linear and logical, but he had difficulty elaborating regarding his anxiety"; insight and judgment were fair; and intelligence was average to above average (R. 189). Plaintiff's June 28, 2007, evaluation at United Summit Center revealed Plaintiff completed his activities of daily living with minimal assistance. He was oriented, times four. His speech, thought concept, and appearance were within normal limits. Plaintiff's sociability was listed as "isolation" (R. 175). Plaintiff had no current suicidal or homicidal thoughts or ideations. Plaintiff was mildly hostile, was not violent, had never demonstrated self-neglect, and had no current thoughts of self-injury. Plaintiff was negative for oppositional behavior; had moderate withdrawal; had mild impulsivity; had mild poor judgment; and did not present with any bizarre behavior. Plaintiff had mild hallucinations, no delusion, and moderate paranoia. Plaintiff's tangential thinking, loose association, and thought blocking processes were normal. Plaintiff had mild concentration and moderate suspicious tendencies. Plaintiff's depression was mild, feelings of guilt were mild, anxiety was moderate, and feelings of hopelessness and helplessness were moderate. Plaintiff had mild apathy, moderate panic, moderate manic, moderate agitation, moderate energy, mild distractibility, moderate change in appetite, mild loss of interest, and acute increased/decreased sleep. Plaintiff's affect was normal; he had no phobic tendency. Plaintiff medicated with Lithium and Seroquel, which reduced his symptoms (R. 176).

The record of evidence also contains the opinion of Dr. Allen, who found Plaintiff's activities of daily living were mildly limited; his ability to maintain concentration, persistence, or pace was mildly limited; and his ability to maintain social functioning was mildly limited (R. 163). This opinion supports the ALJ's credibility finding.

The ALJ considered the medication Plaintiff took to treat his symptoms and the effect that medication had on his condition. Plaintiff treated with either Symbyax and/or Lithium. The ALJ evaluated Dr. Rush's opinion that Plaintiff's symptoms had improved "on psychotropic medications" by July 2007 (R. 20). Additionally, the record contains a statement to Ms. Cottrell at United Summit Center by Plaintiff that his symptoms of depression, hostility, violence and impulsivity decreased significantly as a result of his taking medication (R. 195-96).

In addition to the ALJ's consideration of Plaintiff's mental health history, the testing conducted on him as to his IQ, functioning and limitations, the objective medical evidence provided by mental health professionals who either completed a consultative examination or treated Plaintiff, and the medication Plaintiff took to alleviate his symptoms, the ALJ also considered Plaintiff's statements about his activities of daily living, his statements about his symptoms and the record relative to Plaintiff's statements. The ALJ, in his decision, noted the following:

> [Plaintiff], a 20 year old man with a ninth grade education, alleges that he is disabled due to a manic depressive disorder. At the hearing, he testified that he is schizophrenic and has had panic attacks and anger outbursts since high school that caused him to quit school in the night [sic] grade. He said he once chased his brother around the house with a knife. He testified that after school he tried to work at Dairy Queen and Hardee's but had an emotional breakdown after a month; he then tried to work at a movie theater which he had helped build, but once it opened to the public 'it got so hectic and I had panic attacks.' After that, he tried to work but no one would hire him. He testified that he sees a counselor at Summit Center who 'tries to figure out why I am this way.'

> Regarding his daily activities, the claimant testified that he just tries to stay out of trouble every day. He said [sic] is up all night 'with people talking to me that aren't even there.' He said he is always on the computer doing 'random stuff' including trying to type what the voices say to see if they make sense to anybody else. He takes medication that helps him sleep but doesn't stop the voices. He reluctantly takes out the trash but otherwise just stays in bed all day. He doesn't drive and relies on his friends for transportation (R. 19).

28

The ALJ then considered the statements Plaintiff made to his health care providers. On April 11, 2006, Plaintiff informed Mr. Levin that he experienced mood swings "cycling from depression to anger to sadness and anxiety, and admitted to suicidal ideation with one incident of cutting his wrists." Plaintiff stated he experienced "bouts of impulsive hitting, rolling on the floor and screaming, as well as panic attacks with hyperventilation, tachycardia, diaphoresis and chest pains; however, he said he had only had a few of these and they didn't occur on a regular basis." Plaintiff also informed Mr. Levin that he worked seven hours per day at a movie theater but that he "often called in sick if he didn't want to work on a particular day." The rest of his time was spent on the computer, taking care of his room and his cat, having dinner with his family, hanging out with his brothers, playing the guitar, writing and recording songs, watching television, and hanging out with friends (R. 20).

The ALJ wrote, in his opinion, that, if Plaintiff's "statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record" (R. 18-19). Even though the ALJ did not list each symptom of which Plaintiff complained or each activity of daily living that Plaintiff stated or his physicians found he could perform, the record of evidence supports the ALJ's credibility finding as to Plaintiff.

As noted above, the ALJ listed Plaintiff's activities of daily living as Plaintiff described them to Mr. Levin in April, 2006, which are inconsistent with those statements he made at the administrative hearing. Plaintiff stated, at the hearing, that his activities of daily living were as follows: sorted his dirty laundry and helped his brothers take out the garbage (R. 225-26). Plaintiff stated he could do those chores alone, but "probably wouldn't" complete them. He testified he only

did activities when his brothers ask him to participate. Plaintiff stated he stayed "in [his] bed all the time, just sitting there" (R. 226). Plaintiff listed substantially greater activities to Mr. Levin.

At the administrative hearing, Plaintiff testified he heard the voices of "people talking" to him. Plaintiff stated the voices were not always a loud volume; he remained awake at night because the voice constantly talked (R. 221). The record of evidence contained statements by Plaintiff about his hearing voices, which were inconsistent with the statements he made at the administrative hearing and within the record itself. Even though Plaintiff stated, on June 9, 2006, that he'd experienced "mild auditory hallucinations that [had] been present for 1-2 years" (R. 196), he did not ever inform Dr. Ortenzio of those hallucinations during his treatment of Plaintiff, which was from July, 2005, through March, 2006, the time frame in which Plaintiff heard a voice or voices. Additionally, Plaintiff did not inform Mr. Levin that he experienced mild auditory hallucinations when he was evaluated by Mr. Levin in April, 2006 (R. 140-46). As to that mild auditory hallucination, Plaintiff stated he heard one voice, which he identified as Ian Brown, and this voice "help[ed] him through his daily activities," such as brushing his teeth. Plaintiff stated the voice did not frighten him and it "never told him to hurt himself or others. The voice did "not control his actions" (R. 196). Two months later, however, on August 15, 2006, Plaintiff stated he heard two voices, not one, on a daily basis – one belong to Ian, who as "more like" Plaintiff in that he spoke positive messages, and one who belonged to Gregg, who was negative and was the "opposite" of Plaintiff (R. 187).

Plaintiff's statements at the administrative hearing about his work were also inconsistent with those statements found in the record. Additionally, the record contains assessments by medical providers as to Plaintiff's ability to work. As noted by the ALJ, Plaintiff testified he was unable to

work at one job because he had had an emotional breakdown and he was unable to sustain employment at another job because he had panic attacks. The ALJ considered and evaluated the medical evidence that reflected that Plaintiff had infrequent panic attacks, even though Plaintiff testified he had panic attacks every day (R. 20, 223). Plaintiff informed Dr. Levin that his longest time of employment was four months at McDonald's; however, at the administrative hearing, Plaintiff testified he could not get a job at McDonald's (R. 141, 220). Plaintiff informed Ms. Cottrell, on June 9, 2006, that he'd "lost approx[imately] 13 jobs in 8 months"; however, at the administrative hearing, Plaintiff testified he'd worked at the Dairy Queen, Hardee's, constructing a theater, and at Cinemark (R. 218-20). On January 23, 2006, Plaintiff informed Dr. Ortenzio that he "like[d] job @ Hardee's" (R. 132). On March 20, 2006, Plaintiff stated he was "very happy in job" at Cinemark (R. 131). At the administrative hearing, Plaintiff testified that he did "fine with the construction" job because he was assigned to one area to do work his employers "knew [he] could do." Plaintiff testified he did not have "any frustration" toward any of his construction co-workers, even though he was "scare[d]" and the construction co-workers were "very rude most of the time" (R. 219).

As to his ability to work, the record contains the opinions of two state-agency physicians and Plaintiff's treating physician at United Summit Center. On April 19, 2006, Dr. Shaver found Plaintiff "possess[ed] the mental capacity to maintain gainful employment on a sustained level" (R. 156). On June 22, 2006, Dr. Allen opined that Plaintiff was "doing well enough on Zyprexa to hold a job" (R. 170). In addition to the above opinions by state-agency physicians, Plaintiff's treating physician, Dr. Rush, opined Plaintiff could work on a full time basis "possibly later . . . after achieving stabilization with meds" (R. 206).

The ALJ noted that, at the administrative hearing, Plaintiff's mother testified as follows:

> She said that her son tries to do chores but has to be instructed to take the garbage out of the can and take it to the curb. He has to be reminded to take a shower and put on clean clothes. He tries to help her cook but isn't allowed to use the stove without supervision. She believes he would panic if he had to drive a car. Ms. Lacaria described her son as an intelligent young man who is very confused because of the voices he hears and can't separate reality from non-reality (R. 20).

Plaintiff's mother's statements are not supported by the evidence. As noted by the ALJ, Dr. Rush found Plaintiff could perform specific work-related activities. Dr. Rush opined Plaintiff's ability to follow work rules, use judgment, interact with supervisors, deal with work stresses, and maintain attention and concentration was fair; his ability to understand, remember, and carry out simple job instructions was good; his ability to understand, remember and carry out detailed, but not complex, job instructions was fair; his ability to maintain his personal appearance, behave in an emotionally stable manner, and demonstrate reliability was fair. Dr. Rush also found that Plaintiff's ability to function independently was "'good' or more than satisfactory" (R. 20). The record of evidence contains opinions by those medical professionals who treated or evaluated Plaintiff which contradict the opinion expressed by Plaintiff's mother's at the administrative hearing. In October, 2005, Dr. Ortenzio noted Plaintiff's family believed he had "totally turned his life around" and was "goal oriented, clean, neat, cooperative" and had improved attention (R. 134). Dr. Ortenzio opined, on January 23, 2006, that Plaintiff was making progress with "responsibility" (R. 132). Dr. Shaver found Plaintiff had only mild restrictions of activities of daily living on April 19, 2006 (R. 154). In June, 2006, Plaintiff's counselor at United Summit Center opined Plaintiff was interactive and oriented, times four. She found Plaintiff's insight and judgment "seemed fair" (R. 197). She opined Plaintiff's thought concept was within normal limits (R. 202). On June 22, 2006, Dr. Allen found

Plaintiff was only mildly limited in his activities of daily living (R. 163). In August, 2006, Dr. Schaffner found Plaintiff's thought processes to be "linear and logical"; she noted his insight and judgment were fair; she opined he had average to above average in intelligence (R. 189). On June 28, 2007, Plaintiff's counselor at United Summit Center opined Plaintiff was capable of completing his activities of daily living with minimal assistance (R. 175). She found Plaintiff did not present with any bizarre behavior; his tangential thinking, loose association, and though blocking processes were normal (R. 176). Finally, Plaintiff testified that he could take out the garbage on his own (R. 225-26).

In making his determination as to Plaintiff's RFC, the ALJ took into consideration the above analyzed limitations. The ALJ found that Plaintiff's "ability to perform work at all exertional levels has been compromised by nonexertional limitations" (R. 21). Even though the ALJ found Plaintiff was not entirely credible, he did consider those subjective complaints that were supported by the record of evidence and included those nonexertional limitations in his RFC.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). The undersigned finds substantial evidence supports the ALJ's determination regarding the Plaintiff's credibility.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's application for Supplemental Security Income is supported by substantial evidence, and I, accordingly, recommend that the Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken

Court's docket.

Any party may, within ten (10) days after being served with a copy of this Recommendation for Disposition, file with the Clerk of the Court written objections identifying the portions of the Proposed Findings of Fact and Recommendation for Disposition to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Proposed Findings of Fact and Recommendation for Disposition set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record

Respectfully submitted this **30** day of ___*June*___, 2009.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE